# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **URSULINE COLLEGE** | ) | CASE NO. |
| c/o Tina Jurcisin, Statutory Agent | ) | |
| 2550 Lander Road | ) | JUDGE |
| Pepper Pike, Ohio 44124 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **GANNON UNIVERSITY** | ) | |
| 109 West Sixth Street | ) | |
| Erie, Pennsylvania 16541 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **GREAT MIDWEST ATHLETIC** | ) | |
| **CONFERENCE ("G-MAC")** | ) | |
| 200 S. Meridian Street, Suite 343 | ) | |
| Indianapolis, Indiana 46225 | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR BREACH OF CONTRACT, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER RELIEF

Plaintiffs Ursuline College ("Ursuline") and Gannon University ("Gannon") (collectively "Plaintiffs") bring this Complaint against Defendant Great Midwest Athletic Conference ("G-MAC" or "Conference") and allege as follows:

## **PRELIMINARY STATEMENT**

1. Ursuline is one of six charter members of the G-MAC, having participated in the Conference since its founding in 2011. Ursuline, a historically women's college that now still predominantly serves female students and female student-athletes, founded the G-MAC because it had no other existing conference to join given its female-leaning demographic.

2. Ursuline has remained in good standing throughout its membership, with no record of Conference violations, no compliance deficiencies, and no failure to meet conference requirements.

3. On information and belief, Conference members have raised concerns regarding scheduling logistics associated with Ursuline's athletics program structure, including the absence of corresponding men's programs in certain sports.

4. Gannon is anticipated to complete a merger with Ursuline in or about July 2026.

5. Despite the merger, Ursuline will continue to operate as an independent, stand-alone National Collegiate Athletic Association ("NCAA") Division II institution.

6. The NCAA Division II Membership Committee expressly confirmed this institutional independence by letter dated May 6, 2026, affirming that "although the overall structure has changed, the institution is still recognized and operating as [an] independent, stand-alone institution" and that Ursuline "will remain an active member of Division II following the merger." A true and correct copy of the NCAA's May 6, 2026 determination letter is attached hereto as Exhibit A.

7. Notwithstanding this NCAA determination, G-MAC has taken action to terminate Ursuline's full membership based solely on the post-merger governance structure, without

2

following required procedures, without any finding of a Constitution or Bylaw violation, and without affording Ursuline meaningful due process.

8.      The Conference seized upon the merger as a basis to remove or materially impair Ursuline's membership, notwithstanding Ursuline's good standing and the absence of any violation of Conference rules.

9.      This action is in direct contravention of the G-MAC Constitution, Bylaws, and the Conference's own Merger Task Force policy.

10.      The Conference has further excluded Ursuline from 2027-2028 scheduling activities which are currently underway, causing immediate and irreparable harm to Ursuline's student-athletes and Ursuline's ability to recruit student-athletes.

11.      Plaintiffs bring this action to enforce Ursuline's contractual rights under the G-MAC Constitution and Bylaws, to obtain a declaratory judgment establishing those rights, and to obtain relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

12.      Plaintiffs also seek immediate injunctive relief to preserve the status quo pending resolution of this dispute.

## PARTIES

13.      Plaintiff Ursuline College is a not-for-profit private liberal arts college with its principal place of business at 2550 Lander Road, Pepper Pike, Ohio 44124. Ursuline's student body is primarily made up of women. Ursuline sponsors intercollegiate athletic programs predominantly for women.

14.      Plaintiff Gannon University is a Pennsylvania not-for-profit liberal arts university with its principal place of business at 109 University Square, Erie, Pennsylvania 16541. Gannon maintains a coeducational student body and is presently an active NCAA Division II member.

15. Upon consummation of the merger of Ursuline and Gannon, anticipated to take place in or about July, 2026, Gannon will be the controlling institution, and Ursuline will continue to operate as an independent, stand-alone NCAA Division II institution within the merged structure.

16. Defendant G-MAC is an unincorporated association with its principal place of business at 200 South Meridian Street, Suite 343, Indianapolis, Indiana 46225.

17. G-MAC is an active member conference of the NCAA Division II and governs intercollegiate athletics for its members.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert a federal claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

19. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claim that they form part of the same case or controversy.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District, and Plaintiff Ursuline College is located within this District.

## FACTUAL BACKGROUND

**Ursuline Is a Charter Member in Good Standing with Contractual Rights Under G-MAC's Governing Documents**

21. Ursuline led the founding of G-MAC in 2011 to be an NCAA Division II athletic conference.

4

22.     Ursuline College is one of only six charter members of the Conference, as identified by name in Article III, Section 1 of the G-MAC Constitution.  Then Ursuline President, Sister Diana Stano from the Sisters of Ursuline, and Ursuline's Director of Athletics, Cindy McKnight, founded the G-MAC after Ursuline College had difficulty finding a conference for its predominantly women student-athletes and sought other similarly sized, independent, and faith-based colleges to form the Conference.

23.     The G-MAC Constitution (the "Constitution") and Bylaws (the "Bylaws") (collectively, the "Governing Documents") constitute a binding contract between the Conference and its member institutions, including Ursuline. A true and accurate copy of the Constitution and Bylaws are attached hereto as Exhibits B and C, respectively.

24.     The Governing Documents set forth the rights and obligations of member institutions, the grounds upon which members may be disciplined or expelled, and the procedures to be followed for any such action.

25.     Throughout its membership in the Conference, Ursuline has complied with all requirements of the Governing Documents.

26.     Ursuline has no record of Conference violations, no compliance deficiencies, and no failure to meet applicable requirements. Said otherwise, Ursuline is and has been a member institution of G-MAC in good standing.

27.     Article III, Section 4.2 of the Constitution provides that a member institution is to "[e]xercise institutional control of their intercollegiate athletic programs as defined by the NCAA."

28.     The NCAA does not have a singular definition of "institutional control." Instead, "institutional control" is an NCAA principle that discusses how ultimate responsibility of an institution's intercollegiate athletics program resides in the campus president or chancellor, with

5

focus on oversight, compliance and accountability – not on whether an institution is independently governed in a broader corporate sense.

29. Article III, Section 10.1 of the Constitution provides that a member institution may be placed on probation, suspended, or expelled only "for violation of the Constitution, Bylaws, or Operating Codes," and only upon a two-thirds (2/3) vote of the Presidents' Council.

30. No such violation has been alleged or found as to Ursuline.

### G-MAC's Federal Funding

31. On information and belief, Defendant G-MAC applied for and received financial assistance under the federal Paycheck Protection Program ("PPP"), administered by the United States Small Business Administration pursuant to the CARES Act.

32. On information and belief, the Conference was approved for a PPP loan under federal Award ID 9025867209.

33. As a condition of receiving such assistance, the Conference was required to certify that it would comply with applicable federal laws, including limitations relating to nondiscrimination in its operations and activities.

34. G-MAC's acceptance of PPP assistance and its corresponding compliance certifications establish a federal nexus relevant to G-MAC's obligations when administering athletic opportunities affecting federally funded member institutions.

### G-MAC's Control Over Federally Funded Athletic Opportunities

35. As a member of G-MAC, Ursuline is required to comply with the Conference Constitution, Bylaws, Operating Codes, and other Conference policies adopted by G-MAC and the NCAA.

36.     G-MAC exercises centralized authority over core aspects of intercollegiate athletics, including Conference membership, scheduling, regular-season competition, championship access, and postseason qualification pathways.

37.     The Presidents' Council of G-MAC has final decision-making authority over Conference policy and membership matters. Conference schedules are developed through the Conference Office and governance groups, take priority over non-conference competition, and are binding on member institutions.

38.     Conference affiliation is material to Ursuline's ability to recruit and retain student-athletes because it provides defined schedules, regular-season competition, championship opportunities, and postseason pathways.

39.     As a result of the uncertainty created by G-MAC's stated intent to remove Ursuline from the Conference, at least two current student athletes in women's soccer have left Ursuline to date, and some recruits have declined to attend Ursuline.

40.     The student athlete transfer portal, which allows student athletes to leave one institution for another within the NCAA, is open year round, meaning that student athletes can transfer at any time.

41.     Recruitment for the 2027–2028 academic year is underway. Without clarity regarding its Conference affiliation, Ursuline cannot represent to prospective student-athletes that they will have access to G-MAC schedules, Conference championships, or related post-season opportunities for the 2027-2028 school year and beyond. The uncertainty created by G-MAC's actions has impaired, and continues to impair, Ursuline's ability to recruit student-athletes, retain current student-athletes, and plan future athletic operations.

**G-MAC Adopted a Merger Framework That Required Review and Permitted Waiver**

42.     In June 2025, after Ursuline informed G-MAC that it was pursuing a merger with Gannon University, the G-MAC Presidents' Council formed an ad hoc Merger Committee to review mergers involving member institutions.

43.     Ursuline was not included on the Merger Committee.

44.     At G-MAC's request, Ursuline provided materials in advance of the October 7, 2025 Presidents' Council meeting, including a completed NCAA Acquisition/Consolidation/Merger/Integration Questionnaire, a proposed Chief Campus Officer position description, and a multi-year athletics plan addressing post-merger operations.

45.     On October 7, 2025, the Presidents' Council approved a framework governing the review of institutional mergers (the "Merger Framework"), which established both (a) principles for evaluating merged institutions and (b) a process for reviewing institutional control and potential conflicts of interest.

46.     The Merger Framework expressly contemplates that, where a potential conflict of interest is identified, the affected institution may seek a waiver under the Conference's procedures.

47.     The Merger Framework does not provide that a merger, a change in governance structure, or the existence of a potential conflict of interest automatically disqualifies a member institution from continued Conference membership.

48.     At the October 7, 2025 meeting, Ursuline's President, Dr. David King, presented information regarding the merger and Ursuline's anticipated post-merger structure, including how Ursuline would maintain independent institutional control of its athletics programs. Gannon's President, Dr. Iwanenko, participated in that portion of the meeting to address questions.

49. Following that presentation, Dr. King and Dr. Iwanenko were excluded from further discussion and Dr. King was excluded from the Council's deliberations and vote concerning Ursuline's membership, even though the G-MAC Constitution identifies each member institution's President or Chancellor as that institution's voting representative on the Presidents' Council and contains no express recusal rule applicable to membership determinations. Dr. King was the President of the member institution, Ursuline, at the time.

50. G-MAC thereafter relied on the Merger Framework in taking action affecting Ursuline's membership status, but treated the merger-related governance concern as disqualifying rather than applying the review-and-waiver process contemplated by the Merger Framework.

**G-MAC Treated Ursuline's Merger as Disqualifying Without Identifying a Rules Violation**

51. On October 8, 2025, Ursuline received written correspondence from G-MAC stating that, following the anticipated merger with Gannon University, Ursuline "would cease as an autonomous institution" and, on that basis, would no longer satisfy Conference membership requirements.

52. The October 8, 2025 correspondence did not identify any loss of institutional control as defined by the NCAA, nor did it cite any provision of the G-MAC Constitution or Bylaws establishing "autonomy" as an independent membership requirement. A true and accurate copy of G-MAC's October 8, 2025 correspondence is attached as Exhibit D.

53. Thereafter, G-MAC advised Ursuline that its full membership would be terminated or materially impaired following the merger and that any continued participation in Conference-sponsored competition would be limited to selected programs considered for associate membership.

**Ursuline Invoked G-MAC's Own Framework and Proposed a Practical Path Forward**

54.     Following the October 8, 2025 correspondence, Ursuline sought limited accommodations that would permit continued participation in women's sports while issues relating to the merger were addressed.

55.     Ursuline requested associate membership in the G-MAC in certain women's sports, including basketball, soccer, softball, and volleyball. At a February 17, 2026 G-MAC Joint Council meeting, the Council instead only recommended softball and volleyball for associate membership.

56.     In correspondence dated March 11, 2026, Ursuline advised G-MAC that it had not been consulted regarding that modification prior to the Joint Council's vote.

57.     On April 1, 2026, G-MAC confirmed in writing that it had considered associate membership for softball and volleyball, but provided no explanation as to why the other two sports were not considered and otherwise maintained that Ursuline would not satisfy Conference membership requirements following the merger.

58.     On April 20, 2026, Ursuline submitted a formal Request for Discretionary Waiver under the Conference's Merger Framework (the "Waiver") to the Presidents' Council.

59.     In its Waiver Request, Ursuline sought continued full membership and, in the alternative, requested associate membership in four women's sports—basketball, soccer, softball, and volleyball—together with a targeted waiver of limitations on associate participation.

60.     Ursuline's Waiver Request was submitted within the framework established by G-MAC and proposed specific governance measures designed to address the concerns identified by the Conference.

61. Those proposed measures included, among other things, delegation of attendance at G-MAC meetings, participation at the Presidents' Council, recusal and non-participation protocols, and ongoing reporting or certification mechanisms.

62. On April 30, 2026, G-MAC advised Ursuline that the Presidents' Council would consider the Waiver Request at its next scheduled meeting on June 2, 2026.

63. On May 6, 2026, the NCAA Division II Membership Committee confirmed in writing that, notwithstanding the merger, Ursuline would continue to be recognized as an "independent, stand-alone institution" and would remain an active Division II member with full access to membership benefits. A copy of that correspondence is attached as Exhibit A.

64. That same day, Ursuline provided the NCAA's determination to G-MAC in support of its Waiver Request.

65. On May 7, 2026, Ursuline, through counsel, again contacted G-MAC to explore a path forward and advised that ongoing uncertainty regarding its Conference status was materially affecting recruiting, retention, and operational planning.

66. On May 11, 2026, G-MAC, through counsel, responded that it had acted in good faith with respect to Ursuline, including submitting a letter of support to the NCAA in connection with the Division II Membership Committee's review.

67. At the June 2, 2026 meeting of the Presidents' Council, Ursuline's President, Dr. King, spoke, but did not provide any new information that had not already been provided to the Presidents' Council. regarding the proposed Waiver.

68. G-MAC excluded Ursuline's President, Dr. King, from participating in the Executive Session during which Ursuline's membership and Waiver Request were to have been voted on by G-MAC's Presidents' Council.

11

69.     Following that meeting, G-MAC advised Ursuline that additional time was required for further consideration and indicated that a response would be provided at a later date.

70.     Then, on June 24, 2026, the G-MAC publicly announced that the University of Indianapolis, which has both men's and women's athletic programs, would be joining the G-MAC.

71.     Dues to the G-MAC for the 2026-2027 school year are $30,000 annually.  Upon information and belief, the G-MAC has delayed its response to ensure that it had secured inclusion of the University of Indianapolis to cover the funds it would lose by removing Ursuline.

72.     The ongoing delay in determining Ursuline's membership status has continued to create uncertainty affecting Ursuline's ability to schedule competition, recruit student-athletes, and plan for future athletic operations.

**G-MAC's Actions Disproportionately Burden a Women-Dominant Institution and Women Student-Athletes**

73.     Ursuline is a predominantly female-serving institution, and its intercollegiate athletics programs primarily serve women student-athletes.

74.     In the 2025–2026 academic year, Ursuline enrolled approximately 429 female undergraduate students and 31 male undergraduate students. During that same period, Ursuline sponsored approximately 150 female student-athletes and 14 male student-athletes.

75.     In the 2026–2027 academic year, Ursuline anticipates enrolling a total of approximately 528 female undergraduate students and 80 male undergraduate students, with approximately 172 female student-athletes and 23 male student-athletes.  Student athletes represent 45-50% of the incoming class of students to Ursuline, which could be the largest incoming class in the institution's history.

76. Ursuline sponsors women's programs in sports, including soccer and basketball, and does not sponsor corresponding men's programs in those sports in light of the lower number of male students who attend Ursuline.

77. On information and belief, Conference members have raised concerns regarding scheduling logistics associated with Ursuline's athletics program structure, including the absence of corresponding men's programs in certain sports.

78. G-MAC's actions with respect to Ursuline, including terminating or materially impairing its membership and limiting its access to Conference scheduling, disproportionately restrict athletic participation opportunities for women student-athletes at Ursuline by reducing or eliminating access to conference competition, championships, and related pathways.

79. As a result, the Conference's actions materially burden an institution and athletics program that primarily serves women student-athletes.

80. On June 24, 2026, the G-MAC publicly announced that it plans to add the University of Indianapolis as a member of the Conference effective July 1, 2027. The University of Indianapolis is a school that sponsors both men's and women's programs in sports such as soccer and basketball.

**Ursuline Has No Equivalent Conference Pathway**

81. Ursuline is a charter member of G-MAC, which was formed to provide intercollegiate athletic competition opportunities for similarly situated institutions.

82. Because of Ursuline's size, composition, and program structure, comparable Division II conference opportunities are limited.

13

83.     Prior to forming the G-MAC, and an impetus for doing so, Ursuline had been unable to find its own Division II athletic conference because it did not have certain men's programs.

84.     As soon as the G-MAC announced its initial determination in October 2025, Ursuline began meeting with other Division II athletic conferences to seek alternatives for placement of Ursuline student-athletes – whether in total or by team.

85.     To date, no athletics conference has been found that is willing to take all of Ursuline's sports teams.

86.      As a result, Ursuline's ability to offer viable intercollegiate athletic programs outside of G-MAC is substantially constrained.

**G-MAC's Actions Are Causing Immediate and Irreparable Harm to Student-Athletes and Athletic Programs**

87.     G-MAC's actions and the resulting uncertainty regarding Ursuline's conference status have already caused, and continue to cause, concrete harm to Ursuline's student-athletes and athletic programs.

88.     Ursuline has experienced disruption to recruiting, retention, and program stability, including student-athletes departing from the institution at least in part due to uncertainty regarding Ursuline's continued conference affiliation.

89.     The Conference's actions have also created uncertainty among coaches and staff, impairing Ursuline's ability to maintain continuity in its athletic programs.

90.     Recruitment for the 2027–2028 academic year is currently underway, and Ursuline is unable to represent to prospective student-athletes that it will have conference affiliation, scheduled competition, or access to championship opportunities for that season and beyond.

91.	Absent conference affiliation, Ursuline's student-athletes face the loss of regular-season competition, conference championships, and pathways to postseason play.

92.	These harms are immediate, ongoing, and not fully compensable by monetary damages, and they threaten the viability of Ursuline's athletic programs and the competitive opportunities available to its student-athletes

## COUNT I – BREACH OF CONTRACT

93.	Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

94.	The G-MAC Constitution and Bylaws constitute a binding contract between the Conference and its member institutions, including Ursuline.

95.	Ursuline accepted the terms of those Governing Documents upon its admission as a charter member of the Conference and has performed its obligations thereunder at all relevant times, including but not limited to, the payment of dues.

96.	Defendant G-MAC has breached the Governing Documents, including but not limited to, in the following respects:

a.	The Conference purported to terminate or materially impair Ursuline's full membership rights without a finding of any violation of the Constitution, Bylaws, or Operating Codes, in breach of Article III, Section 10.1 of the G-MAC Constitution, which limits sanctions and expulsions to such violations.

b.	The Conference applied an "autonomy" standard for members not contained in the Constitution, Bylaws, or NCAA manual, in breach of Article III, Section 4.2, which requires only "institutional control" as defined by the NCAA – a standard Ursuline satisfies, as confirmed by the NCAA Membership Committee.

15

c.  The Conference failed to follow its own Merger Task Force policy, which requires documented review, factual findings, and consideration of waivers before taking action against a member institution on the basis of a merger.

d.  The Conference excluded Ursuline from the executive session deliberations concerning its own membership, denying Ursuline the procedural rights to which it is entitled under the Governing Documents.

e.  The Conference has excluded Ursuline from 2027-2028 athletic event scheduling activities currently underway, in breach of Ursuline's rights as a full member of the Conference entitled to participate in Conference-scheduled competition.

f.  The Conference has conducted its activities in a manner inconsistent with Bylaw 12.1.2's requirement that Conference activities be conducted free of bias with regard to gender, by disproportionately burdening Ursuline, a predominantly female institution, and by treating Ursuline arbitrarily in its application of membership standards contrary to Bylaw 4.1.2.

97.  As a direct and proximate result of the Conference's breaches, Plaintiffs have suffered and continue to suffer damages in the form of, *inter alia*, loss of student-athletes, disruption of recruiting, loss of competitive opportunities, scheduling exclusion, reputational harm, the threatened loss of conference affiliation and championship access, as well as costs incurred in connection with this litigation.

98.  The harms to Ursuline from these breaches are not fully compensable in monetary damages. Accordingly, Ursuline is entitled to both compensatory and injunctive relief.

16

## COUNT II – DECLARATORY JUDGMENT
28 U.S.C. §§ 2201-2202

99.     Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

100.    An actual, present, and justiciable controversy exists between Ursuline and the Conference concerning Ursuline's rights under the G-MAC Constitution and Bylaws, including but not limited to, whether:

a.  Ursuline's post-merger status satisfies the institutional control standard set forth in Article III, Section 4.2 of the G-MAC Constitution;

b.  The Conference had authority to terminate or impair Ursuline's membership rights absent a finding of violation of the Constitution, Bylaws, or Operating Codes;

c.  The Conference was required to follow its Merger Task Force review policy before taking action against Ursuline's membership;

d.  Ursuline is entitled to full membership in the Conference following the merger; and

e.  Ursuline is entitled to participate in 2027-2028 Conference scheduling and beyond.

101.    Plaintiffs request that the Court enter a declaratory judgment holding that:

a.  Ursuline satisfies the institutional control requirement of G-MAC Constitution Article III, Section 4.2, as confirmed by the NCAA Division II Membership Committee in its May 6, 2026 letter;

b.  The G-MAC Constitution does not authorize the termination or material impairment of Ursuline's membership rights absent a finding of a violation of the Constitution, Bylaws, or Operating Codes through a compliant disciplinary process;

17

c.  The Conference was required to follow its Merger Task Force review policy, including affording Ursuline an opportunity to present information and respond to identified concerns, before taking action affecting Ursuline's membership status;

d.  Ursuline is entitled to full membership in the Conference following the completion of its merger with Gannon, consistent with the NCAA's determination; and

e.  Ursuline is entitled to participate in all Conference scheduling activities on the same basis as other full member institutions.

## COUNT III – VIOLATION OF TITLE IX
20 U.S.C. § 1681 et seq.

102.  Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

103.  On information and belief, G-MAC has received federal financial assistance through the Paycheck Protection Program ("PPP"), administered by the United States Small Business Administration, including under Award ID 9025867209.

104.  As a condition of that assistance, G-MAC was required to certify compliance with applicable federal laws, including nondiscrimination requirements.

105.  Independently of its receipt of federal assistance, G-MAC exercises centralized authority over core aspects of intercollegiate athletics at its member institutions, including membership status, access to scheduled competition, and eligibility for conference championships.

106.  These decisions are binding on member institutions and directly determine whether, and to what extent, student-athletes at those institutions may participate in organized intercollegiate athletics.

107.  Each G-MAC member institution, including Ursuline, receives federal financial assistance and is subject to Title IX.

18

108. Through its governance decisions, G-MAC functions as a gatekeeper for athletic participation opportunities at federally funded institutions.

109. Title IX prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance, including extracurricular intercollegiate athletics.

110. Ursuline is a predominantly female institution, and its intercollegiate athletics programs primarily serve women student-athletes.

111. G-MAC's actions with respect to Ursuline—including terminating or materially impairing its membership, excluding it from Conference scheduling, and limiting access to Conference-sponsored competition—disproportionately restrict athletic participation opportunities for women student-athletes.

112. As a result of G-MAC's actions, Ursuline's women student-athletes are deprived of access to conference competition, conference championships, and postseason opportunities.

113. G-MAC's governance decisions directly control whether women student-athletes at a federally funded institution may participate in intercollegiate athletics within the Conference.

114. As a direct and proximate result of G-MAC's conduct, Plaintiffs have suffered and continue to suffer loss of athletic opportunities, disruption of recruiting and retention, and loss of access to competition and championships.

115. Plaintiffs are entitled to declaratory and injunctive relief, and such other relief as the Court deems appropriate.

116. The Conference's governance decisions, including membership determinations and scheduling access, directly control whether and to what extent women student-athletes at a primarily female institution can participate in organized intercollegiate competition.

19

117.     These decisions fall squarely within the scope of authority over which Title IX concerns have been heightened in recent years, as private athletic associations exercise increasing control over core aspects of federally funded intercollegiate athletics.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Ursuline College and Gannon University respectfully request that the Court enter judgment in their favor and against Defendant Great Midwest Athletic Conference, and award the following relief:

1. On Count I – Breach of Contract:

   a. A judgment that Defendant breached the G-MAC Constitution and Bylaws by terminating or materially impairing Ursuline's full membership rights in G-MAC without a finding of a violation of G-MAC's Constitution, Bylaws, or Operating Code, by applying an unauthorized "autonomy" standard in lieu of the NCAA-defined institutional control standard incorporated by the Governing Documents, by failing to follow the G-MAC Merger Task Force review policy, and by excluding Ursuline from athletic scheduling activities while it remains a member in good standing;

   b. A permanent injunction requiring G-MAC to reinstate Ursuline to full Conference membership, to include Ursuline in all scheduling and championship activities on the same basis as other full members, and to process any future membership determination in compliance with the G-MAC Constitution, Bylaws, and Merger Task Force policy; and

   c. An award of compensatory damages in an amount to be determined at trial, together with attorneys' fees and costs to the extent permitted by law.

20

2.  On Count II – Declaratory Judgment:

    a.  A declaration that Ursuline satisfies the institutional control standard of Article III, Section 4.2 of the G-MAC Constitution as confirmed by the NCAA Division II Membership Committee, and that this standard, and not an autonomy-based criteria, governs Ursuline's membership eligibility;

    b.  A declaration that the Conference lacked authority to terminate or impair Ursuline's membership absent a violation of the Governing Documents, that the Conference was required to follow its Merger Task Force policy before taking action, and that G-MAC's membership determination is procedurally deficient and without legal effect; and

    c.  A declaration that Ursuline is entitled to full membership in the Conference following its merger with Gannon and to participate in scheduling, championship, and governance activities on the same basis as other full member institutions.

3.  On Count III – Violation of Title IX:

    a.  A declaration that G-MAC's actions terminating or impairing Ursuline's membership and excluding it from scheduling and championship access constitute unlawful sex discrimination in violation of Title IX, insofar as those actions disproportionately burden the athletic opportunities of women student-athletes at a predominantly female institution;

    b.  A permanent injunction requiring G-MAC to cease and desist from applying membership standards, scheduling decisions, or championship eligibility determinations that disparately burden Ursuline's women's athletic programs without justification; and

    c.    An award of compensatory damages, attorneys' fees and costs, and such other relief as the Court deems appropriate to remedy the Title IX violations alleged herein.

4.  On All Counts:

    a.    A temporary restraining order and preliminary injunction pending resolution of this action, restraining Defendant from taking any action to terminate, suspend, or impair Ursuline's full Conference membership or exclude Ursuline from any membership benefit and athletics scheduling to which full members are entitled;

    b.    Pre- and post-judgment interest on any monetary award to the extent permitted by law; and

    c.    Court costs and reasonable attorney's fees; and

    d.    Such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/ Matthew R. Duncan*
Matthew R. Duncan (0076420)
Hilary F. DeSaussure (0098989)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH 44308
Telephone:    (330) 253-5060
Email: mrduncan@bmdllc.com
            hfdesaussure@bmdllc.com

and

Krista W. Osterfeld (0097842)
**BRENNAN, MANNA & DIAMOND, LLC**
41 S. High Street, Suite 3750
Columbus, Ohio 43215
Telephone:    (614) 246-7500
Email: kwosterfeld@bmdllc.com
*Counsel for Plaintiffs Ursuline College*
*and Gannon University*

## VERIFICATION

STATE OF OHIO       )
                           ) ss

COUNTY OF SUMMIT)

    I, Cynthia McKnight, in my capacity as Director of Athletics for Ursuline College, being sworn according to law, state that I have read the foregoing Complaint, and that the allegations contained therein are true and correct to the best of my knowledge.



*Cynthia McKnight*    06/30/2026 11:12 AM EDT

Cynthia McKnight

    SWORN TO and subscribed before me, a Notary Public, on and for said County and State, this 30th day of June, 2026.



*Tiffany Jodon*    06/30/2026 11:14 AM EDT

Notary Public

Online Notary Public. This notarial
act involved the use of online
audio/video communication
technology. Notarization facilitated
by SIGNiX®

4902-7689-2601, v. 1

23