IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| URSULINE COLLEGE and<br>GANNON UNIVERSITY | : | CASE NO. 1:26-cv-1498 |
| | : | |
| | : | |
| Plaintiffs, | : | JUDGE |
| | : | |
| v. | : | |
| | : | |
| GREAT MIDWEST ATHLETIC | : | |
| CONFERENCE ("G-MAC") | : | |
| | : | |
| Defendant. | | |

_____

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

_____

Matthew R. Duncan (0076420)
Hilary F. DeSaussure (0098989)
BRENNAN, MANNA & DIAMOND, LLC
75 E. Market Street
Akron, OH 44308
Telephone: (330) 253-5060
Email: mrduncan@bmdllc.com
hfdesaussure@bmdllc.com

and

Krista W. Osterfeld (0097842)
BRENNAN, MANNA & DIAMOND, LLC
41 S. High Street, Suite 3750
Columbus, Ohio 43215
Telephone: (614) 246-7500
Email: kwosterfeld@bmdllc.com
*Counsel for Plaintiffs Ursuline College
and Gannon University*

# TABLE OF CONTENTS

Table of Contents………………………………………….…………………..i

Table of Authorities..............................................................................................iii

Issues to be Decided…………………………………………………………….v

Summary of Argument..........................................................................................vi

Motion for Temporary Restraining Order and Preliminary Injunction……………………1

Memorandum in Support .......................................................................….3

I. Introduction.........................................................................................3

II. Background ........................................................................................5

A. Ursuline's Charter Membership and Good Standing............................5

B. The Ursuline-Gannon Merger and G-MAC's Response......................6

C. Ursuline's Continued Efforts to Preserve Conference Membership…………………………………………………….................7

D. G-MAC's Actions Causing Immediate and Irreparable Harm ........................................................................……8

III. Law and Argument..............................................................................9

A. Legal Standard ..................................................................................9

B. Plaintiffs are Likely to Succeed on the Merits....................................11

1. Plaintiffs are likely to succeed on their breach of contract claim............................................................................11

2. Plaintiffs are likely to succeed on their declaratory judgment claim..........................................................................15

3. Plaintiffs are likely to succeed on their Title IX claim ................18

C. Ursuline Will Suffer Irreparable Harm Absent Injunctive Relief ......................................................................................20

D. The Balance of Hardship Favors Plaintiffs…………………....…23

E.  The Public Interest Favors Injunction ...................................................24

F.  Bond………………………………………………………………….25

IV.  CONCLUSION .............................................................................................25

CERTIFICATE OF LIMITED NOTICE ..................................................................27

# TABLE OF AUTHORITIES

**Statutes and Authorities**

Fed. R. Civ. P. 65...............................................................................1, 25, 27

Title IX.............................................................................18, 20, 24, 25

20 U.S.C. 1681(a)(2)...........................................................................20

20 U.S.C. 1681(a)(5)...........................................................................20

**Case Law**

*Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006)……………………………..20

*Badri v. Huron Hosp.,* 691 F. Supp. 2d 744, 769-770 (N.D. Ohio 2010) ..........................13

*Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992)…………...………10, 20

*Bhan v. Battle Creek Health Sys.,* 579 F. Appx. 438, 448-49 (6th Cir. 2014).....................13

*Bruzzese v. Chesapeake Exploration, LLC,* 998 F. Supp. 2d 663, 670-71 (N.D. Ohio 2014) ...............................................................................10

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007) ...............................................................10, 11, 20

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 696 (6th Cir. 2006)……………………………………………………………..19, 25

*Davis v. Echo Valley Condominium Ass'n,* 945 F.3d 483 (6th Cir. 2019)..........................13

*Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 732-33 (6th Cir. 2021)…………24, 25

*In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985)..........................10, 11, 23

*Donovan v. Lebanon,* 261 N.E.3d 467, 474 (Ohio Ct. App. 2024)...................................16

*Hamilton v. Ohio Department of Health,* 42 N.E.3d 1261, 1270 (Ohio Ct. App. 2015) ......................................................................17

*Horner v, Kentucky High Sch. Athletic Ass'n,* 43 F.3d 265, 272 (6th Cir. 1994).........................................................................18, 19

*Lexington-Fayette Urban Cnty. Gov't,* 305 F.3d 566 (6th Cir. 2002) ..................................10

*Material Handling Sys., Inc. v. Cabrera*, 572 F. Supp. 3d 375, 399 (W.D. Ky. 2021)…....24

*Mid-Am. Fire & Cas. Co. v. Heasley,* 113 Ohio St. 3d 133, 136 (2007)............................16

*MIKMAR, Inc. v. Westfield Ins. Co.,* 520 F. Supp. 3d 933, 948
(N.D. Ohio 2021) ..........................................................................................................16

*Moltan Co. v. Eagle-Picher Indus*., 55 F.3d 1171, 1176 (6th Cir. 1995)…………………25

*National Collegiate Athletic Ass'n v. Miller,* 795 F. Supp. 1476
(D. Nev. 1992)..............................................................................................................12

*NCAA v. Tarkanian,* 488 U.S. 179, 183 (1988)..................................................................12

*Oliver v. National Collegiate Athletic Ass'n,* 155 Ohio Misc. 2d 8, ¶17
(Ohio Com. Pl. 2008)..............................................................................................11, 12

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,* 305 F.3d 566
(6th Cir. 2002)........................................................................................................10, 20

*PCC Airfoils, LLC v. Daugherty,* 176 F.4[th] 509, 514 (6th Cir. 2026).....................10, 11, 20

*Sashti, Inc. v. Glunt Indus., Inc.,* 140 F. Supp. 2d 813, 816 (N.D. Ohio
2001) ...........................................................................................................................13

*Wymsylo v. Bartec, Inc.,* 132 Ohio St.3d 167, 970 N.E.2d 898, 909 (2012)......................16

# ISSUES TO BE DECIDED

I.     Whether it appears likely that Plaintiffs, Ursuline College and Gannon University, will prevail on the merits of their claims for enforcement of contractual rights under Defendant, G-MAC's Constitution and Bylaws, to obtain a declaratory judgment establishing those rights, and to obtain relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

II.    Whether that Plaintiffs will be irreparably harmed unless the requested injunctive relief is granted.

III.   Whether the equities between the parties weigh in favor of granting injunctive relief to Plaintiffs.

IV.   Whether the public interest weighs in favor of the Temporary Restraining Order and Preliminary Injunction requested by Plaintiffs.

## SUMMARY OF ARGUMENT

Plaintiffs, Ursuline College ("Ursuline") and Gannon University ("Gannon") move for a Temporary Restraining Order and Preliminary Injunction against Defendant, Great Midwest Athletic Conference ("G-MAC").

Gannon is anticipated to complete a merger with Ursuline in or about July 2026. After the merger, Ursuline will continue to operate as an independent, stand-alone National Collegiate Athletic Association ("NCAA") Division II institution. The NCAA Division II Membership Committee expressly confirmed Ursuline's institutional independence by letter dated May 6, 2026. Despite this NCAA determination, G-MAC has taken action to terminate Ursuline's full membership based solely on the post-merger governance structure, without following required procedures, without any finding of a Constitution or Bylaw violation, and without affording Ursuline meaningful due process. G-MAC has excluded Ursuline from 2027-2028 athletics scheduling activities which are currently underway, causing immediate and irreparable harm to Ursuline's student-athletes and Ursuline's ability to recruit student-athletes.

G-MAC's actions against Ursuline constitute a breach of its own Constitution and Bylaws, including but not limited to because G-MAC's governing documents incorporate the NCAA's standard for institutional independence, and GMAC's governing documents only allow for expulsion of a member institution for wrongdoing which in no way has been alleged here. G-MAC's actions also violate Title IX as discriminatory against women student-athletes' participation and opportunities in intercollegiate sports since Ursuline's student body and athletic program are predominantly made up of women and G-MAC is adding another institution as a member instead.

G-MAC should be enjoined from terminating, suspending, or otherwise impairing Ursuline's full membership in the Conference, or otherwise denying Ursuline any rights, privileges, or benefits attendant to full Conference membership, including participation in Conference governance, scheduling for the 2027-2028 athletics season, championship eligibility, and other Conference activities.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISON

| | | |
|---|---|---|
| **URSULINE COLLEGE**, **et al.** | ) | CASE NO. 1:26-cv-1498 |
| | ) | |
| Plaintiffs, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| **GREAT MIDWEST ATHLETIC** | ) | |
| **CONFERENCE ("G-MAC")** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Ursuline College ("Ursuline")

and Gannon University ("Gannon") (collectively, "Plaintiffs") respectfully move this Court for a

Temporary Restraining Order and Preliminary Injunction preserving the status quo pending

resolution of this action. Specifically, Plaintiffs request that the Court: (1) restrain and enjoin

Defendant Great Midwest Athletic Conference ("G-MAC" or the "Conference") from terminating,

suspending, or otherwise impairing Ursuline's full membership in the Conference, or otherwise

denying Ursuline any rights, privileges, or benefits attendant to full Conference membership,

including participation in Conference governance, scheduling, championship eligibility, and other

Conference activities; (2) require G-MAC to include Ursuline in all Conference scheduling and

related athletic activities for the 2027-2028 academic year on the same basis as every other full

member institution; and (3) require G-MAC to maintain Ursuline's full membership status and

refrain from making or implementing any final membership determination unless and until it does

so in compliance with the G-MAC Constitution, Bylaws, and Merger Framework, and further

1

order such other relief as is necessary to preserve the parties' respective rights pending final adjudication of this action.

This Motion is supported by Plaintiffs' Verified Complaint, the Affidavit of Dr. David King filed contemporaneously herewith, the accompanying Memorandum in Support, all pleadings and papers filed in this action, and any evidence or argument presented at any hearing on this Motion. Plaintiffs further submit a Proposed Order for the Court's consideration.

Respectfully submitted,

*/s/ Matthew R. Duncan*
Matthew R. Duncan (0076420)
Hilary F. DeSaussure (0098989)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH 44308
Telephone: (330) 253-5060
Email: mrduncan@bmdllc.com
        hfdesaussure@bmdllc.com

and

Krista W. Osterfeld (0097842)
**BRENNAN, MANNA & DIAMOND, LLC**
41 S. High Street, Suite 3750
Columbus, Ohio 43215
Telephone: (614) 246-7500
Email: kwosterfeld@bmdllc.com
*Counsel for Plaintiffs Ursuline College
and Gannon University*

## I. INTRODUCTION

Plaintiff Ursuline College ("Ursuline") is one of only six charter members of Defendant Great Midwest Athletic Conference ("G-MAC" or the "Conference"). Verified Compl. ¶ 1. Ursuline helped establish the Conference in 2011 after similarly situated institutions lacked an NCAA Division II conference that could accommodate Ursuline's predominantly women's athletics programs. Verified Compl. ¶¶ 1, 21-22. Since joining the Conference, Ursuline has remained a member in good standing. Verified Compl. ¶¶ 2, 25-30. It has never been found to have violated the G-MAC Constitution, Bylaws, or Operating Codes, has never been cited for any compliance deficiency, and has continuously satisfied every Conference membership obligation. Verified Compl. ¶¶ 2, 25-30. Nevertheless, Defendant has sought to terminate or materially impair Ursuline's Conference membership despite identifying no violation of any Conference rule. Verified Compl. ¶¶ 7-10, 30, 43, 51-53.

The Conference's actions arise solely from Ursuline's anticipated merger with Plaintiff Gannon University. Verified Compl. ¶¶ 4-6, 42-53. These actions were taken by G-MAC despite the NCAA Division II Membership Committee (the entity responsible for determining NCAA membership status) expressly determining on May 6, 2026 that, notwithstanding the merger, Ursuline would continue to operate as an "independent, stand-alone institution" and would remain an active NCAA Division II member. Verified Compl. ¶¶ 6, 63, Exhibit A. G-MAC nevertheless concluded that Ursuline supposedly would no longer satisfy Conference membership requirements because it would cease being an "autonomous institution," even though the Conference's Governing Documents contain no such membership requirement. Verified Compl. ¶¶ 51-53, 96(b).

The Conference also failed to follow the procedures required by its own Constitution, Bylaws, and Merger Framework before taking adverse action against Ursuline. Verified Compl.

3

¶¶ 42-68, 96. Although the Merger Framework expressly contemplates review of governance issues and permits discretionary waivers where concerns exist, G-MAC treated the merger itself as disqualifying rather than applying the "review and waiver" process it adopted. Verified Compl. ¶¶ 45-50, 58-69. Ursuline submitted the requested materials, proposed governance safeguards, and formally requested a discretionary waiver designed to address every concern identified by the Conference. Verified Compl. ¶¶ 44, 58-66. Despite this, G-MAC also excluded Ursuline's President from Executive Session deliberations concerning Ursuline's own membership and has continued excluding Ursuline from Conference scheduling for the 2027-2028 academic year while delaying a determination of Ursuline's waiver request. Verified Compl. ¶¶ 67-72, 96(d)-(e).

The resulting harm to Ursuline is immediate and irreparable. Verified Compl. ¶¶ 87-92. At least two student athletes have already transferred because of the uncertainty surrounding Ursuline's Conference membership, and prospective student-athletes have declined to enroll for the same reason. Verified Compl. ¶¶ 39, 87-90. Recruiting for the 2027-2028 academic year is currently underway, and the NCAA transfer portal remains open year-round. Verified Compl. ¶¶ 40-41, 90. Conference scheduling for the 2027-2028 academic year is also underway; however, Ursuline has been excluded from those scheduling activities by G-MAC. Verified Compl. ¶¶ 10, 16, 71-72, 96(e). Once Conference schedules are finalized without Ursuline, neither this Court nor a later damages award can recreate, *inter alia*, lost competition opportunities, recruiting cycles, conference championships, or postseason pathways for Ursuline's student-athletes. Verified Compl. ¶¶ 87-92.

Accordingly, Plaintiffs seek a temporary restraining order and preliminary injunction preserving the status quo while this litigation proceeds. Specifically, Plaintiffs request that the Court require G-MAC to continue recognizing Ursuline as a full Conference member, prohibit G-

MAC from taking further action to terminate or impair Ursuline's membership, and require G-MAC to include Ursuline in all Conference scheduling and membership benefits pending final resolution of this case. Verified Compl. ¶¶ 97-117.

## II. BACKGROUND

### A. Ursuline's Charter Membership and Good Standing.

Ursuline is one of only six charter members of G-MAC and played a critical role in establishing the Conference in 2011 since Ursuline lacked a viable NCAA Division II conference capable of accommodating its athletics programs. Verified Compl. ¶¶ 1, 21-22. The G-MAC Constitution expressly identifies Ursuline as a charter member, and the Conference's Constitution and Bylaws constitute the binding contractual agreement governing the relationship between G-MAC and its member institutions. Verified Compl. ¶¶ 22-24. Those Governing Documents, *inter alia*, establish the rights and obligations of member institutions, define the standards governing Conference membership, and prescribe the exclusive grounds upon which a member institution may be disciplined, suspended, or expelled. Verified Compl. ¶¶ 24, 27-30. Specifically, Article III, Section 4.2 requires each member institution to exercise "institutional control" over its athletics program as defined by the NCAA, while Article III, Section 10.1 provides that a member institution may be placed on probation, suspended, or expelled only upon a finding that it violated the Constitution, Bylaws, or Operating Codes and only upon approval by a two-thirds vote of the Presidents' Council. Verified Compl. ¶¶ 27-30.

Throughout its fifteen (15) year membership, Ursuline has fully complied with every obligation required under the Governing Documents. Verified Compl. ¶¶ 25-26. Ursuline has never been cited for a Conference violation, never been found out of compliance with Conference requirements, and has continuously remained a member institution in good standing. Verified

5

Compl. ¶¶ 2, 25-30. Consistent with this, G-MAC has never alleged that Ursuline violated any provision of the Constitution, Bylaws, or Operating Codes. Verified Compl. ¶¶ 30, 43.

**B. The Ursuline-Gannon Merger and G-MAC's Response**

In 2025, Ursuline informed G-MAC that it was actively pursuing a merger with Gannon University, after which Gannon would become the controlling institution while Ursuline would continue operating as an independent, stand-alone NCAA Division II institution with its own campus, athletics department, and athletic programs. Verified Compl. ¶¶ 10-15, 42. In response, G-MAC established an ad hoc Merger Committee, and the Presidents' Council subsequently adopted a Merger Framework establishing certain criteria for evaluating institutional mergers and procedures for reviewing primarily institutional control issues and potential conflicts of interest. Verified Compl. ¶¶ 42-47. Of significance, the Merger Framework did not provide that a merger or modified governance structure automatically made a member institution ineligible for Conference membership. Verified Compl. ¶¶ 46-47. Rather, the Merger Frameork expressly contemplated that governance concerns could be addressed through discretionary waivers under Conference procedures. Verified Compl. ¶¶ 46, 58-61.

At G-MAC's request, Ursuline submitted extensive information regarding the proposed merger, including an NCAA merger questionnaire, a proposed Chief Campus Officer position description, and a multi-year athletics plan describing Ursuline's post-merger operations. Verified Compl. ¶¶ 44, 48. Ursuline's President Dr. David King personally presented those materials to the Presidents' Council and explained how Ursuline would continue exercising independent institutional control over its athletics program after the merger. Verified Compl. ¶¶ 48-49. Following that presentation, however, G-MAC excluded Ursuline's President from further deliberations regarding Ursuline's membership. This exclusion occurred notwithstanding that the

6

G-MAC Constitution identifies each member institution's president as its voting representative on the Presidents' Council and contains no express recusal requirement applicable to membership determinations. Verified Compl. ¶ 49.

Rather than applying the review and waiver process established by its own Merger Framework, G-MAC instead treated the merger itself as a "disqualifying" event. Verified Compl. ¶ 50. On October 8, 2025, the Conference advised Ursuline that it purportedly would no longer satisfy Conference membership requirements because it would cease being an "autnomous institution" following the merger. Verified Compl. ¶ 51. The Conference did not identify any loss of NCAA institutional control, cite any provision of the G-MAC Constitution or Bylaws establishing "autonomy" as a membership requirement, or identify any violation of the Governing Documents. Verified Compl. ¶¶ 52-53.

**C. Ursuline's Continued Efforts to Preserve Conference Membership**

Despite G-MAC's October 2025 determination, Ursuline continued to work cooperatively with the Conference to preserve athletic opportunities for its student athletes. Verified Compl. ¶¶ 54-57. Ursuline initially requested associate membership in four women's sports pending resolution of broader membership issues were resolved, but G-MAC recommended associate membership in only two of those sports without explaining why the remaining programs were excluded. Verified Comp. ¶¶ 54-57.

On April 20, 2026, Ursuline formally invoked the exact process established by G-MAC's Merger Framework by submitting a Request for Discretionary Waiver to the Presidents' Council. Verified Compl. ¶ 58. The waiver sought continued full Conference membership and, alternatively, associate membership in women's basketball, soccer, softball, and volleyball, together with targeted relief from limitations on associate participation. Verified Compl. ¶ 59.

Ursuline also proposed numerous governance safeguards – including delegated participation at Conference meetings, recusal protocols, and continuing reporting obligations – to address every governance concern identified by the Conference. Verified Compl. ¶¶ 60-61.

While Ursuline's waiver request was pending, the NCAA Division II Membership Committee independently reviewed the merger and on May 6, 2026, expressly determined that Ursuline would remain an "independent, stand-alone institution" and continue as an active NCAA Division II member following the merger. Verified Compl. ¶¶ 6, 63. Ursuline immediately provided that determination to G-MAC in support of its waiver request. Verified Compl. ¶ 64. After this, Ursuline's counsel continued communicating with G-MAC in an effort to reach a practical resolution, advising the Conference that ongoing uncertainty regarding Conference membership was already negatively impairing recruiting, student retention, and athletic planning. Verified Compl. ¶¶ 65-66.

At the June 2, 2026 meeting of the Presidents' Council, Ursuline again appeared and addressed its waiver request. Verified Compl. ¶ 67. Nevertheless, G-MAC excluded Ursuline's President from the Executive Session during which Ursuline's membership and waiver request were considered. Verified Compl. ¶ 68. Rather than issue a decision, G-MAC delayed its determination while continuing to exclude Ursuline from Conference scheduling activities and, shortly thereafter, publicly announced that the University of Indianapolis would be joining the Conference beginning with the 2027-2028 academic year. Verified Compl. ¶¶ 69-72.

**D. G-MAC's Actions Causing Immediate and Irreparable Harm**

G-MAC's actions have already caused real, concrete injury to Ursuline and its student athletes. Verified Compl. ¶¶ 39-41, 87-92. At least two current women student athletes have transferred because of the uncertainty surrounding Ursuline's Conference membership,

prospective recruits have declined enrollment, and recruiting for the 2027-2028 academic year is presently underway while the NCAA transfer portal remains open year-round. Verified Compl. ¶¶ 39-41, 87-90. At the same time, G-MAC has excluded Ursuline from Conference scheduling for the 2027-2028 academic year despite Ursuline's continued good standing and the absence of any disciplinary finding authorized by the Conference's Governing Documents. Verified Compl. ¶¶ 29-30, 71-72, 96(e).

The consequences of G-MAC's actions extend well beyond scheduling. Ursuline was instrumental in creating G-MAC because its predominantly women's athletics programs historically limited its ability to obtain membership in another NCAA Division II conference. Verified Compl. ¶¶ 81-83. Since receiving G-MAC's October 2025 determination, Ursuline has diligently explored alternative Division II conference affiliations but has been unable to identify any conference willing to accept all of its athletic programs. Verified Compl. ¶¶ 84-86. Consequently, without injunctive relief, Ursuline and its student athletes face the imminent loss of Conference competition, championship opportunities, recruiting advantages, and long-term program stability. Verified Compl. ¶¶ 87-92. Thes harms that cannot be adequately remedied through monetary damages after Conference schedules have been finalized. Verified Compl. ¶ 98.

## III. LAW AND ARGUMENT

### A. Legal Standard

A motion for a temporary restraining order is governed by the same standard as a motion for a preliminary injunction, and the Sixth Circuit applies an identical four-factor analysis to both. A court must consider: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would

be served by the injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). A preliminary injunction is "an extraordinary remedy" that should issue only where the movant carries its burden of showing the circumstances clearly demand it. *Id.*

These four factors are not rigid prerequisites but considerations to be balanced against one another, and the degree of showing required on any one factor can vary depending on the strength of the others. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Where irreparable harm and the balance of hardships weigh heavily in the movant's favor, a correspondingly lower showing on the merits may suffice. *Id.* The Sixth Circuit recently reaffirmed that a movant need not satisfy any particular evidentiary standard—such as a preponderance or clear and convincing evidence—as to each factor individually; the analysis remains an equitable balancing exercise. *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 514 (6th Cir. 2026). Ultimately, two elements function as floors: some likelihood of success and some risk of irreparable injury are both required, and the absence of either is generally fatal to the motion. *Id.*

Relative specifically to irreparable harm, the relevant inquiry is whether the harm is not fully compensable by monetary damages, including because the loss would be difficult to calculate, and whether that harm is actual and imminent rather than speculative. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). Courts in this Circuit have distinguished between harms that are simply economic losses recoverable through damages, which are not irreparable, and harms involving the forfeiture of an opportunity that cannot be recreated after the fact, which typically are. *See Overstreet*, 305 F.3d at 578 (holding that potential job loss did not constitute irreparable

harm because lost income is "quintessentially reparable by money damages" in the form of back pay). As set forth below, each of these four factors weighs in Plaintiffs' favor.

**B. Plaintiffs Are Likely to Succeed on the Merits**

Under the Sixth Circuit's balancing approach, the likelihood of success factor does not require Plaintiffs to prove their case in full at this stage of the litigation. It is typically sufficient that Plaintiffs have raised "questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *In re DeLorean*, 755 F.2d at 1229; *Certified Restoration Dry Cleaning Network, L.L.C.* at 543. The degree of likelihood required varies inversely with the strength of the other three factors. *In re DeLorean*, 755 F.2d at 1229. Where, as is the caes here, irreparable harm and the balance of hardships weigh in Plaintiffs' favor, a lower showing on the merits suffice. The Sixth Circuit's most recent guidance confirms this approach: a movant "does not need to establish a quantum of proof – whether a preponderance or clear and convincing evidence – with respect to each factor to be eligible for preliminary relief." *PCC Airfoils, LLC*, 176 F.4th at 513. The only mandatory threshold showings are **<u>some</u>** likelihood of success and some risk of irreparable injury. If a plaintiff cannot demonstrate a likelihood of success on the merits or some risk of irraprable harm, "there is nothing left to balance." *Id.* at 513. As detailed below, Plaintiffs meet exceed these thresholds for all three claims.

**1. *Plaintiffs are likely to succeed on their Breach of Contract claim.***

Under Ohio law, the constitution and bylaws of a voluntary athletic association constitute a binding contract between the association and its member institutions. The Ohio Court of Common Pleas in *Oliver v. National Collegiate Athletic Ass'n* held that the NCAA's constitution, operating bylaws, and administrative bylaws represent the contract between the association and its

member institutions, and denied summary judgment on a breach of contract claim premised on the NCAA's failure to provide fair procedures. 155 Ohio Misc. 2d 8, ¶ 17 (Ohio Com. Pl. 2008). This principle is not unique to the NCAA; rather, it reflects the general rule that the governing documents of a voluntary association bind the association and its members as a matter of contract once a member accepts the benefits of membership. Federal courts have similarly enforced athletic association governing documents as binding contracts. *See National Collegiate Athletic Ass'n v. Miller*, 795 F. Supp. 1476 (D. Nev. 1992) (holding that member institutions "voluntarily and contractually agreed to abide by" the association's rules in exchange for membership benefits); *NCAA v. Tarkanian*, 488 U.S. 179, 183 (1988) (recognizing that "by joining the [association], each member agrees to abide by and enforce the [a]ssociation's rules").

The standard elements of contract formation under Ohio law – offer, acceptance, and consideration – are likewise satisfied here. *See Bruzzese v. Chesapeake Exploration, LLC*, 998 F. Supp. 2d 663, 670-71 (N.D. Ohio 2014). Ursuline is one of only six charter members of G-MAC and accepted the rights and obligations established by the Conference's Constitution and Bylaws when it helped found the Conference in 2011. Verified Compl. ¶¶ 21-24. In exchange, G-MAC agreed to provide the contractual benefits of Conference membership, including participation in Conference governance, scheduling, regular-season competition, championship eligibility, and other membership benefits. Verified Compl. ¶¶ 23-24, 35-38. The mutual exchange of those rights and obligations constitutes adequate consideration under Ohio law. Moreover, Ursuline continuously performed its contractual obligations, remaining a member in good standing with no Conference violations, compliance deficiencies, or failure to satisfy Conference requirements throughout its fifteen (15) year membership. Verified Compl. ¶¶ 2, 25-30, 95.

This is exact;y the type of contractual relationship the Sixth Circuit has enforced in analogous association contexts. *See Davis v. Echo Valley Condominium Ass'n*, 945 F.3d 483 (6th Cir. 2019) (applying contract principles to enforce association bylaws). It is readily distinguishable from the narrow category of cases declining to find a contract, which generally involve the absence of consideration or an express disclaimer of contractual intent. *See Bhan v. Battle Creek Health Sys.*, 579 F. Appx. 438, 448-49 (6th Cir. 2014); *Badri v. Huron Hosp.*, 691 F. Supp. 2d 744, 769-770 (N.D. Ohio 2010). No such disclaimer exists here, and to the contrary, the G-MAC Constitution and Bylaws expressly define the rights and obligations of member institutions and condition valuable membership benefits (including Conference scheduling, championship participation, governance rights, and revenue distribution) upon compliance with the Governing Documents. Verified Compl. ¶¶ 23-30, 35-38.

Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages. *Sashti, Inc. v. Glunt Indus., Inc.*, 140 F. Supp. 2d 813, 816 (N.D. Ohio 2001). Plaintiffs have demonstrated a substantial likelihood of proving each element. First, as discussed above, the G-MAC Constitution and Bylaws constitute an enforceable contract governing the relationship between G-MAC and its member institutions. Verified Compl. ¶¶ 23-24.

Ursuline has fully performed its obligations under that contract. Ursuline has remained a charter member in good standing since the Conference's inception, has never been found to violate the Constitution, Bylaws, or Operating Codes, has never incurred compliance deficiencies, and has satisfied every contractual obligation imposed by the Governing Documents. Verified Compl. ¶¶ 2, 25-30, 95.

The Verified Complaint alleges multiple, independent breaches of the Governing Documents. G-MAC purported to terminate or materially impair Ursuline's membership without identifying any violation of the Constitution, Bylaws, or Operating Codes, notwithstanding Article III, Section 10.1's express limitation on suspension or expulsion. Verified Compl. ¶¶ 29-30, 43, 51-53, 96(a). G-MAC further applied an "autonomy" requirement that appears nowhere in the Constitution or Bylaws, despite Article III, Section 4.2 requiring only that member institutions maintain NCAA-defined "institutional control"—a standard the NCAA Division II Membership Committee expressly concluded Ursuline satisfies following the merger. Verified Compl. ¶¶ 6, 27-30, 51-53, 63-64, 96(b).

The Conference also failed to follow the Merger Framework it adopted specifically to evaluate institutional mergers. That Framework contemplates review of institutional-control concerns, factual findings, and discretionary waivers where appropriate, and expressly does not provide that a merger automatically disqualifies a member institution. Verified Compl. ¶¶ 42-50. Ursuline fully participated in that process by providing the requested documentation, presenting its post-merger governance structure, submitting a formal waiver request, and proposing governance safeguards specifically designed to address the Conference's concerns. Verified Compl. ¶¶ 44, 48, 58-66. Rather than apply its own procedures, however, G-MAC treated the merger itself as disqualifying and delayed any final decision while simultaneously excluding Ursuline from Conference membership benefits. Verified Compl. ¶¶ 50-51, 71-72.

The Conference also denied Ursuline the procedural protections afforded by its own Governing Documents by excluding Ursuline's President—the institution's designated representative on the Presidents' Council—from Executive-Session deliberations concerning Ursuline's own membership, despite the absence of any express recusal requirement applicable to

14

membership determinations. Verified Compl. ¶¶ 49, 67-68. Finally, while Ursuline remains a member in good standing and before completing any contractually compliant membership determination, G-MAC has excluded Ursuline from Conference scheduling for the 2027-2028 academic year and other membership benefits to which full members are entitled. Verified Compl. ¶¶ 16, 35-41, 71-72.

These breaches have caused (and continue to cause) substantial injury to Plaintiffs. G-MAC's actions have already resulted in the loss of current student athletes, disrupted recruiting, impaired roster stability, created uncertainty among coaches and staff, and threaten Ursuline's ability to participate in Conference competition, championships, and postseason opportunities during the 2027-2028 academic year and beyond. Verified Compl. ¶¶ 39-41, 89-92. Because those injuries flow directly from G-MAC's breaches of the Governing Documents, Plaintiffs have demonstrated a strong likelihood of success on their breach of contract claim.

### 2. *Plaintiffs are likely to succeed on their Declaratory Judgment claim.*

Plaintiffs also seek a declaratory judgment establishing their rights under the G-MAC Constitution, Bylaws, and Merger Framework. Specifically, Plaintiffs seek declarations that: (1) Ursuline satisfies the institutional control requirement contained in Article III, Section 4.2 of the G-MAC Constitution; (2) G-MAC lacks authority to terminate or materially impair Ursuline's membership absent a finding that Ursuline violated the Constitution, Bylaws, or Operating Codes; (3) G-MAC was required to comply with its own Merger Framework and waiver procedures before taking action affecting Ursuline's membership; and (4) Ursuline is entitled to continued full membership and participation in Conference scheduling, governance, championship, and related activities following its merger with Gannon. Verified Compl. ¶¶ 99-101.

Under Ohio law, a plaintiff seeking declaratory relief must establish three elements: (1) a real controversy exists between the parties; (2) the controversy is justiciable in character; and (3) speedy relief is necessary to preserve the parties' rights. *MIKMAR, Inc. v. Westfield Ins. Co.*, 520 F. Supp. 3d 933, 948 (N.D. Ohio 2021) citing *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 970 N.E.2d 898, 909 (2012). Plaintiffs satisfy each of these requirements.

Here, a real controversy unquestionably exists. A real controversy requires a genuine dispute between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Donovan v. Lebanon*, 261 N.E.3d 467, 474 (Ohio Ct. App. 2024). This dispute is neither hypothetical nor contingent. G-MAC has already advised Ursuline that it purportedly will no longer satisfy Conference membership requirements following the merger based upon an "autonomy" requirement not contained in the Governing Documents. Verified Compl. ¶¶ 51-53. Although the NCAA Division II Membership Committee determined that Ursuline will continue operating as an "independent, stand-alone institution" and remain an active Division II member following the merger, G-MAC has nevertheless continued to impair Ursuline's membership rights. Verified Compl. ¶¶ 6, 63-66. The Conference excluded Ursuline's President from deliberations concerning Ursuline's membership, delayed ruling on Ursuline's waiver request, and has already excluded Ursuline from Conference scheduling for the 2027-2028 academic year while continuing to withhold a final membership determination. Verified Compl. ¶¶ 67-72. Accordingly, the "danger or dilemma" facing Plaintiffs is not contingent upon some future event; rather, it is occurring now. *Mid-Am. Fire & Cas. Co. v. Heasley*, 113 Ohio St. 3d 133, 136 (2007).

Second, the controversy is justiciable. Ursuline has standing because G-MAC's actions directly impair its contractual membership rights, its ability to participate in Conference

governance, scheduling, championship competition, and postseason opportunities, and the athletic opportunities available to its student-athletes. Verified Compl. ¶¶ 35-41, 100-101. This case involves far more than a generalized grievance or speculative future injury; it presents a present and ongoing impairment of Ursuline's bargained-for contractual rights under the Governing Documents. Verified Compl. ¶¶ 23-30, 96-101. The dispute is likewise ripe because G-MAC is presently excluding Ursuline from Conference scheduling and related membership benefits while recruiting and scheduling for the 2027-2028 academic year continue without Ursuline's participation. Verified Compl. ¶¶ 16, 39-41, 71-72, 87-92.

Finally, speedy relief is necessary to preserve Plaintiffs' rights. Unlike *Hamilton v. Ohio Department of Health*, where the plaintiff failed to demonstrate that delay would meaningfully affect access to the requested relief, the need for immediate judicial intervention here is concrete and readily quantifiable. 42 N.E.3d 1261, 1270 (Ohio Ct. App. 2015). Conference scheduling for the 2027-2028 academic year is actively underway, recruiting for that academic year is ongoing, and the NCAA transfer portal remains open year-round. Verified Compl. ¶¶ 40-41, 71-72, 87-92. Each day that passes without declaratory relief further impairs Ursuline's ability to recruit and retain student-athletes, participate in Conference scheduling, and preserve its competitive opportunities. Verified Compl. ¶¶ 39-41, 87-92. Once Conference schedules are finalized without Ursuline, the Court cannot meaningfully restore those lost opportunities through a final judgment entered months or years later.

Because a genuine and immediate controversy exists, the dispute is fully justiciable, and prompt judicial intervention is necessary to preserve Plaintiffs' contractual rights before those rights are irretrievably lost, Plaintiffs have demonstrated a substantial likelihood of success on their claim for declaratory judgment.

17

**3.** *Plaintiffs are likely to succeed on their Title IX claim.*

Plaintiffs are likely to succeed on their Title IX claim. As an initial matter, the Conference is properly subject to Title IX. The Verified Complaint alleges that G-MAC received federal financial assistance through the Paycheck Protection Program ("PPP"), including PPP Award ID 9025867209, and certified its compliance with applicable federal laws as a condition of receiving those funds. Verified Compl. ¶¶ 31-34, 103-104. Independently, G-MAC exercises centralized authority over core aspects of intercollegiate athletics at its member institutions, including Conference membership, scheduling, regular-season competition, championship eligibility, and postseason qualification. Verified Compl. ¶¶ 35-38, 105-110. Each G-MAC member institution, including Ursuline, likewise receives federal financial assistance and is subject to Title IX. Verified Compl. ¶ 107.

The Sixth Circuit has recognized that an athletic association may qualify as a Title IX recipient where, among other things, it receives dues from federally funded member institutions and exercises controlling authority over the athletic programs of those institutions. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994). Applying a substance-over-form approach, the Sixth Circuit has rejected "artificial distinctions in [institutional] structure" that would permit organizations exercising substantial control over federally funded educational athletics to evade Title IX's requirements. *Id.* Here, Plaintiffs allege both direct federal financial assistance and central authority over athletic participation opportunities at federally funded member institutions. Verified Compl. ¶¶ 31-38, 103-110. Those allegations are sufficient, at a minimum, to establish a substantial likelihood that G-MAC is subject to Title IX.

The Sixth Circuit has further held that Title IX requires "gender-blind equality of athletic opportunity" and that a covered athletic association may violate Title IX by denying equal athletic

opportunities without proof of discriminatory intent. *Horner*, 43 F.3d at 273; *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F.3d 676, 696 (6th Cir. 2006). The relevant inquiry is whether the challenged conduct results in unequal athletic opportunities on the basis of sex. *Communities for Equity*, 459 F.3d at 696. Here, the Complaint alleges that Ursuline is a predominantly female institution whose athletics programs overwhelmingly serve women student-athletes. Verified Compl. ¶¶ 73-79, 110-112. During the 2025-2026 academic year, Ursuline enrolled approximately 429 female undergraduate students compared to only 31 male undergraduate students and sponsored approximately 150 female student-athletes compared to only 14 male student-athletes. Verified Compl. ¶¶ 74-76. Although Ursuline anticipates increased male enrollment following the merger, women will continue to comprise the overwhelming majority of both its student body and its athletics participants. Verified Compl. ¶ 75.

By terminating or materially changing Ursuline's membership, excluding Ursuline from Conference scheduling, and restricting access to Conference-sponsored competition, championships, and postseason pathways, G-MAC has disproportionately burdened athletic participation opportunities available to women student-athletes. Verified Compl. ¶¶ 78-80, 111-117. Those actions have already negatively impacted recruiting and retention, caused current student athletes to transfer, discouraged prospective student-athletes from enrolling, and threaten continued access to Division II athletic competition for an institution whose athletics programs primarily serve women. Verified Compl. ¶¶ 39-41, 87-92, 114-117. Unlike the scheduling disparities at issue in *Communities for Equity*, the Conference's actions here threaten to deprive Ursuline's women student athletes of Conference membership benefits altogether, including regular season competition, championship opportunities, and established postseason pathways. Verified Compl. ¶¶ 35-41, 78-92.

No statutory exemption stands to shield G-MAC's conduct. Title IX's exemptions for certain single-sex educational institutions are limited to admissions practices of those institutions. *See* 20 U.S.C. § 1681(a)(2), (5). Those exemptions do not authorize a third-party athletic conference to deny athletic participation opportunities or otherwise discriminate against a member institution because it predominantly serves women. Plaintiffs' Title IX claim challenges the Conference's governance decisions and therefore falls outside the scope of any statutory exemption.

Accepting the well-pleaded allegations of the Verified Complaint as true, Plaintiffs have alleged that G-MAC, an entity subject to Title IX, has exercised its authority over Conference membership and athletic participation in a manner that disproportionately deprives women student athletes of equal athletic opportunities. Plaintiffs have therefore demonstrated a substantial likelihood of success on their Title IX claim.

C. **Ursuline Will Suffer Irreparable Harm Absent Injunctive Relief.**

In the Sixth Circuit, "the existence of an irreparable injury is mandatory," even though the extent of that injury may be weighed against the remaining preliminary injunction factors. *PCC Airfoils* at 513 (6th Cir. 2026). A harm is irreparable where it "is not fully compensable by monetary damages," including where "the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). The injury must also be actual and imminent, rather than speculative or theoretical. *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

The harm alleged here is neither speculative nor merely economic. Unlike the lost wages at issue in *Overstreet v. Lexington-Fayette Urban County Government*, which could be remedied

through an award of back pay, the injuries facing Ursuline cannot be recreated or adequately compensated after the fact. 305 F.3d at 566. The Verified Complaint establishes that Conference scheduling for the 2027-2028 academic year is presently underway and that G-MAC has already excluded Ursuline from those scheduling activities. Verified Compl. ¶¶ 10, 16, 71-72. Once Conference schedules are finalized without Ursuline, no subsequent court order can recreate a Conference schedule, restore lost competitive opportunities, or meaningfully return Ursuline and its student-athletes to the position they would have occupied absent G-MAC's actions.

The Verified Complaint likewise establishes that G-MAC's actions have already disrupted Ursuline's athletics programs. At least two current student-athletes have transferred because of the uncertainty surrounding Ursuline's Conference membership, prospective student-athletes have declined to enroll, and recruiting for the 2027-2028 academic year is presently underway. Verified Compl. ¶¶ 39-41, 87-90. The NCAA transfer portal remains open throughout the year, permitting additional student-athletes to transfer at any time while this uncertainty persists. Verified Compl. ¶ 40. Those recruiting and retention losses cannot be recreated through a monetary award after litigation concludes.

Nor are Plaintiffs' injuries limited to recruiting. G-MAC's actions threaten Ursuline's continued access to Conference competition, championship opportunities, and established postseason qualification pathways, all of which constitute core benefits of Conference membership. Verified Compl. ¶¶ 35-41. Once an athletic season passes without Conference participation, those lost competitive opportunities cannot be restored. Moreover, uncertainty surrounding Conference membership has already impaired Ursuline's ability to plan future athletic operations and maintain continuity among its coaches and athletic programs. Verified Compl. ¶¶ 65, 87-90.

The irreparable nature of these injuries is further highlighted by the absence of any meaningful alternative. Ursuline helped establish G-MAC because its unique composition and predominantly women's athletics programs historically prevented it from securing membership in another NCAA Division II conference. Verified Compl. ¶¶ 21-22, 81-83. Since G-MAC first advised Ursuline that it intended to impair its membership, Ursuline has actively explored alternative Division II conference affiliations but has been unable to identify any conference willing to accept all of its athletic programs. Verified Compl. ¶¶ 84-86. Consequently, without injunctive relief, Ursuline's student-athletes face the imminent loss of Conference competition and the unique athletic opportunities associated with G-MAC membership.

Of most significance, these harms extend beyond Ursuline itself to the hundreds of student athletes whose educational and athletic opportunities depend upon continued Conference membership. Ursuline is a predominantly female institution, and approximately forty-five to fifty percent of its incoming students are student-athletes. Verified Compl. ¶¶ 73-79. G-MAC's actions have already impaired those students' ability to compete, recruit, and remain at Ursuline, and those losses cannot be adequately measured or compensated in money damages. Verified Compl. ¶¶ 39-41, 87-92.

These are precisely the types of injuries the Sixth Circuit has recognized as irreparable because they involve the permanent loss of unique competitive, educational, and contractual opportunities that cannot be restored through a subsequent damages award. Plaintiffs have therefore established that they will suffer immediate and irreparable harm absent preliminary injunctive relief.

22

### D. The Balance of Hardship Favors Plaintiffs.

The balance of hardships requires the Court to weigh the injury Plaintiffs will suffer absent injunctive relief against any injury G-MAC would suffer if the requested injunction is granted. Where, as here, "the balance of hardships tips decidedly in the movant's favor, a lower showing on the merits may be sufficient to justify relief." *In re DeLorean* at 1229. Conversely, only where the defendant would bear the injunction's burden "as heavily" as the plaintiff would a stronger showing on the merits be required. *Id.* That circumstance is plainly not present here.

The hardship to Plaintiffs from denial of relief is immediate, substantial, and irreversible. As alleged in the Verified Complaint, G-MAC has already excluded Ursuline from Conference scheduling activities for the 2027-2028 academic year while those schedules are being developed. Verified Compl. ¶¶ 10, 16, 71-72. Ursuline has already lost current student athletes, prospective recruits have declined enrollment, and continuing uncertainty regarding Conference membership is disrupting recruiting, retention, athletic planning, and program stability. Verified Compl. ¶¶ 39-41, 65, 87-92. Absent injunctive relief, Ursuline and its student-athletes face the loss of Conference competition, championship opportunities, and the competitive benefits associated with G-MAC membership, injuries that cannot be undone once scheduling and recruiting cycles have concluded. Verified Compl. ¶¶ 35-41, 78-92. The hardship is particularly dire because Ursuline has diligently explored alternative NCAA Division II conference affiliations and has been unable to locate another conference willing to accept all of its athletic programs. Verified Compl. ¶¶ 81-86.

By contrast, the hardship to G-MAC from issuance of the requested injunction is minimal. Plaintiffs do not seek to compel G-MAC to admit a new member, alter Conference operations, or permanently resolve the parties' dispute before trial. Rather, Plaintiffs seek only to preserve the status quo by requiring G-MAC to continue recognizing Ursuline as the full member it has been

since the Conference's inception while this Court adjudicates the parties' rights. Verified Compl. ¶¶ 21-30. The requested injunction merely requires G-MAC to continue affording Ursuline the same membership benefits (including participation in Conference scheduling, governance, and related activities) that it has historically had access to p ending a final determination on the merits. Verified Compl. ¶¶ 35-38.

Moreover, requiring G-MAC to comply with the contractual procedures and obligations contained in its own Constitution, Bylaws, and Merger Framework imposes no cognizable hardship. Those are the exact rules G-MAC voluntarily adopted to govern its relationship with member institutions and upon which Ursuline relied as a charter member of the Conference. Verified Compl. ¶¶ 23-30, 42-50. Because Plaintiffs face immediate and irreparable injury while G-MAC will suffer little, if any, prejudice from maintaining the parties' longstanding relationship pending final adjudication, the balance of hardships weighs overwhelmingly in favor of granting preliminary injunctive relief.

### E. The Public Interest Favors Injunction

The public interest factor favors injunctive relief. Courts have recognized that the public interest is served by enforcement of valid contractual obligations. *See e.g. Material Handling Sys., Inc. v. Cabrera*, 572 F. Supp. 3d 375, 399 (W.D. Ky. 2021) (enforcement of valid restrictive covenants serves the public interest). Here, there is no logical basis to treat enforcement of an athletic conference's own constitution and bylaws any differently.

The public interest is further and independently served because the requested injunction would prevent ongoing sex discrimination in violation of Title IX. While the Sixth Circuit's enjoining a law or policy that violates constitutional rights is always in the public interest principle arose in the constitutional context, the same logic applies. *Dahl v. Bd. of Trs. of W. Mich. Univ.*,

15 F.4th 728, 732-33 (6th Cir. 2021) (citaton omitted). Giving full force to federal statutory civil rights protection, there is no public interest in permitting an athletic conference to exclude a women-dominant institution from conference benefits on a basis that disproportionately burdens women student athletes. *Communities for Equity*, 459 F.3d at 676. To the contrary, the public interest affirmatively favors ensuring that women student athletes retain equal access to the competitive and educational opportunities Title IX was enacted to protect.

### F. Bond

Fed. R. Civ. P. 65(c) requires the Court to fix a bond only "in such sum as the Court deems proper." Given that the proposed injunction requires only that the Conference follow its own existing obligations, including *inter alia* Ursuline in scheduling and completing the required merger review process, the Conference faces no financial risk from compliance. Plaintiffs respectfully request that the bond requirement be waived, or in the alternative, set at a nominal amount. *See Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (court has discretion to set minimal or nominal bond).

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a temporary restraining order and preliminary injunction, restraining and enjoining Defendant from terminating or impairing Ursuline's full G-MAC membership, requiring Defendant to include Ursuline in 2027-2028 athletics scheduling activities, and requiring Defendant to make Ursuline's membership determination in compliance with the G-MAC Constitution, Bylaws, and Merger Task Force policy.

Respectfully submitted,

*/s/ Matthew R. Duncan*
Matthew R. Duncan (0076420)
Hilary F. DeSaussure (0098989)
**BRENNAN, MANNA & DIAMOND, LLC**
75 E. Market Street
Akron, OH 44308
Telephone:      (330) 253-5060
Email: mrduncan@bmdllc.com
            hfdesaussure@bmdllc.com

and

Krista W. Osterfeld (0097842)
**BRENNAN, MANNA & DIAMOND, LLC**
41 S. High Street, Suite 3750
Columbus, Ohio 43215
Telephone:      (614) 246-7500
Email: kwosterfeld@bmdllc.com
*Counsel for Plaintiffs Ursuline College
and Gannon University*

# CERTIFICATION OF LIMITED NOTICE PURSUANT TO FED. R. CIV. P. 65

I, Matthew R. Duncan, counsel for Plaintiffs Ursuline College and Gannon University, pursuant to Federal Rule of Civil Procedure 65, certify as follows:

1. Plaintiffs have made reasonable efforts to provide Defendant with notice of this action and Plaintiffs' request for temporary injunctive relief under the circumstances.

2. Specifically, on July 1, 2026 at 7:00 a.m., I notified Defendant, through its counsel, that Plaintiffs intended to file this action and seek emergency temporary restraining order and preliminary injunctive relief. Plaintiffs further provided Defendant with copies of the Complaint, Motion for Temporary Restraining Order and Preliminary Injunction, Memorandum in Support, and supporting materials, or advised Defendant that such filings would be made immediately upon filing.

3. Because the threatened injury to Plaintiffs is imminent, Plaintiffs have been unable to provide the amount of advance notice that ordinarily would accompany a request for preliminary injunctive relief. Delaying the filing of this Motion to permit additional notice would materially increase the risk that Defendant will take actions causing immediate and irreparable harm before the Court has an opportunity to consider Plaintiffs' request.

4. Plaintiffs therefore respectfully request that the Court consider the Motion for Temporary Restraining Order on an expedited basis and set the matter for the earliest practicable hearing on Plaintiffs' request for a preliminary injunction.

/s/ Matthew R. Duncan
Matthew R. Duncan (0076420)
*Counsel for Plaintiffs Ursuline College
and Gannon University*

4908-4392-2617, v. 1

27